## John J. Brennan, et al. v. The People, etc.
### Gen. No. 11,626.

1. FALSE PERSONATION OF VOTER—*when indictment charging, is sufficient.* An indictment charging false personation of a voter, is sufficient, where in the language of the statute.

2. GENERAL ACCESSORY ACT—*not repealed by Election Law.* The general accessory section of the criminal code is not repealed as to Chicago and the Town of Cicero by the Election Law applicable to those jurisdictions.

3. CONSPIRATORS—*when declarations of, should be excluded.* Where the unsworn declarations of an alleged conspirator of the defendants have been admitted upon the promise of the State's Attorney that he would make the proper connection, and such connection is not made, it is reversible error for the court to refuse to strike such declarations from the record, where harmful.

FREEMAN, P. J., dissenting.

Criminal prosecution for violation of election law. Error to the Criminal Court of Cook County; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1904. Affirmed in part; reversed in part and remanded. Opinion filed March 26, 1904.

WILLIAM S. FORREST and BENJAMIN C. BACHRACH, for plaintiffs in error; WILLIAM H. BARNUM and EDDY, HALEY & WETTEN, of counsel.

CHARLES S. DENEEN, State's Attorney, and ALBERT C. BARNES, Assistant State's Attorney, for defendant in error.

MR. JUSTICE STEIN delivered the opinion of the court.

At the December term, 1903, of the Criminal Court of Cook county, plaintiffs in error, John J. Brennan, Charles

A. McCarle and Herbert E. Kent, were found guilty of procuring and assisting two other persons in falsely personating two electors; and after motions for a new trial and in arrest of judgment had been overruled, were sentenced to the House of Correction, Brennan for one year, McCarle for six months and Kent for three months. This writ brings up for review the record of the trial.

The indictment consists of seven counts. The first two, in slightly differing language, charge plaintiffs with conspiring and agreeing with one Foley and other unknown persons to procure and assist divers persons each to falsely personate another person and vote in his name in the twenty-seventh precinct of the eighteenth ward of the city of Chicago at a judicial election held in said city and in the county of Cook on the first day of June, 1903, for the election of fourteen judges of the Circuit Court and one judge of the Superior Court of said county. The third count charges a conspiracy like the first two and describes the illegal act as procuring and assisting two persons each to vote at said election without having a lawful right to vote. The fourth count also charges a conspiracy and describes the illegal act as inducing two persons by promising them a reward of money to vote at said election. The fifth count charges that at said election and in said precinct plaintiffs in error unlawfully falsely personated an elector by the name of John Veneman and voted in his name. The sixth count charges that at said election and in said precinct plaintiffs unlawfully falsely personated an elector by the name of William Flysen and voted in his name. The seventh count charges that at said election and in said precinct plaintiffs unlawfully procured and assisted Edward J. Barrett and Jacquin L. Lait each to falsely personate and vote in the name of another person.

The jury rendered a verdict finding plaintiffs guilty as charged in the fifth, sixth and seventh counts of the indictment; thereby acquitting them of the offenses charged in the first four.

First. Section 408 of the Criminal Code (Hurd's Rev.

Stat. 1901) provides that " every indictment shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes creating the offense, or so plainly that the nature of the offense may be easily understood by the jury." It is argued that the motion in arrest of judgment should have been sustained because counts 5, 6 and 7 state a legal result merely, and are defective in not stating the facts whence the legal result comes. We do not concur in this contention. To charge that one falsely personated another and voted in his name is to charge, not a legal result, but a fact capable of being "easily understood" by everybody. The averments in the language of the statute apprised plaintiffs in error with reasonable certainty of the nature of the accusation against them, so that they had ample opportunity to prepare their defense. Loehr v. People, 132 Ill. 504; Cole v. People, 84 Ill. 216.

Second. Counts 5 and 6 are founded upon the first clause, and count 7 upon the sixteenth clause of paragraph 256 on page 828 of Hurd's Rev. Stat. of 1901, said paragraph being a part of what is commonly known as the Chicago Election Law. Said first clause is as follows : " If at any election hereafter held in any such city  *   *   * any person shall falsely personate any elector or other person and vote or attempt or offer to vote in or under the name of such elector or other person." The sixteenth clause is as follows : " Or shall aid, counsel, advise, or procure or assist any voter, person or judge of election or other officer of election to do any act by law forbidden or in this act constituted an offense."

It is contended that under and by reason of the last clause, to " aid, counsel, advise, procure or assist " a person in the city of Chicago or town of Cicero in falsely personating an elector or in doing anything " by law forbidden or in this act constituted an offense " is a distinct, independent, substantive offense which must be prosecuted as such and without reference to the general statute of this state defining accessories to be indicted and punished as

principals, and that therefore the general statute concerning accessories has no application to and cannot be read into counts 5 and 6. If this contention be correct, it follows that the motion in arrest of judgment should not have been denied as to these counts. On their face they both charge a fact physically impossible, to wit, that three persons personated one other one and voted in his name. In support of this contention it is urged that the election law upon which the indictment is based is in force and effect in Chicago and the town of Cicero only, and by implication works a repeal of the general statute touching accessories so far as Chicago and Cicero are concerned. We regard the question as settled by Lionetti v. People, 183 Ill. 252, where the Supreme Court upon a similar indictment containing the same charges made against an accessory as in counts 5 and 6 of the present indictment, held the general statute applicable to the election law. There, as here, the plaintiff in error was indicted for falsely personating and voting in the name of another; and there, as here, there was no proof that by his own act he did so vote. It was proven he was present when the crime was committed; that he aided, advised, abetted and assisted actively and personally in its commission. Upon these facts the Supreme Court say: "Under our statute he is deemed a principal offender, and is to be tried and punished accordingly. It is not essential the indictment against one who is guilty as an accessory under the statute shall describe the circumstances of the offense as they actually occurred. The allegations may charge in direct terms the accused actually did that which is the legal effect of such acts as were performed by him. Such an allegation is fully supported by proof that another did that which is directly alleged to have been done by the accused, if it be shown the accused was present and as in this case aided, advised, encouraged and assisted such other to do the prohibited acts."

Under this ruling as applied to the indictment and the proof in the case before us, the seventh count is simply a repetition of the fifth and sixth counts boiled into one, and

a mere restatement in other language of what is charged in them. The proof for the people tended to show that Edward J. Barrett, mentioned in the seventh count, personated John Veneman mentioned in the fifth, and that Jacquin L. Lait, mentioned in the seventh count, personated William Flysen, mentioned in the sixth.

Third. Shortly after the filing of the record in this court an application was made for a stay of proceedings which, had it been granted, might have resulted in the release of plaintiffs in error from imprisonment pending the writ of error. Upon that application the foregoing points together with others were presented to us and duly considered. It is now urged for the first time that the guilt of the accused was not proven beyond a reasonable doubt; in other words, that the verdict is against the weight of the evidence.

Although the accused were acquitted of guilt under the conspiracy counts and although the counts under which they were convicted charge no conspiracy, yet the situation at the trial was such that in order to secure their conviction under the counts last mentioned a conspiracy had to be shown to have existed among them having for its object the procuring and assisting the people's witness, Barrett, to personate Veneman and vote in his name, and the people's witness, Lait, to falsely personate Flysen and vote in his name. This became necessary because outside of the mere unsworn declarations of persons not put upon the witness stand there is no proof that Brennan and McCarle had anything to do with the act of false personation or with the things that led up to it or prepared the way for doing it; and as to McCarle his name is not mentioned even in the unsworn declarations. There is no direct proof of a conspiracy among the defendants. It was sought to be inferred from their acts which were—as the proof tended to show—that Kent furnished persons with names not their own, written on slips of paper, and with such information pertaining to the names as the judges of election would be likely to elicit from them; that Barrett and Lait having received such slips were accompanied into the polling booths,

the one by Brennan and the other by McCarle; that without any request for instruction Brennan marked the ballot of Lait and paid him money. If the evidence had shown that any voter who was to falsely personate and vote in the name of another was told or instructed by Kent when he gave him a slip of paper to show it to some person or hold it in his hands where it could be seen, or that in the matter of marking his ballots and paying money Brennan or McCarle discriminated and distinguished between voters who had slips and those who had none, there would be a basis from which an inference that a conspiracy existed might be drawn. But there is no such proof in the record, except that Barrett's testimony will possibly bear the construction that he saw McCarle mark the ballots of four men who held slips in their hands and saw Brennan pay them money. But his own slip Barrett says was crumpled in his hands, and neither does he nor any one else say that the marking of ballots or paying of money was limited to those who had slips in their hands. If a conspiracy existed (which we do not think the proof shows) Brennan was not shown to be connected with it. True, it was in Brennan's saloon that Kent handed over the slips; but there is no proof that Brennan was present or had knowledge from any source of the giving out of slips.

Upon the assumption that a conspiracy would be shown and the promise of the state's attorney that he would make the necessary connection, the court in the opening stages of the trial permitted the people by the witness Barrett to prove the declarations of one Foley and an unknown and unidentified young man, both alleged conspirators with the defendants. Foley and the young man were not called as witnesses by the people, and the defendants swore they did not know them and had never heard of them. We think the conspiracy was not shown and the promise to make the necessary connection not kept, and therefore the motion of the defendants made when the people rested and again at the close of all the evidence to exclude the declarations should have been granted. To one of the defend-

ants, Brennan, these unsworn declarations were specially hurtful. The election was on Monday, June 1, and according to Barrett, Foley said to him on the Friday preceding, " You don't need to be broke; go down and see old man Brennan and he will stake you to your lodging and meals and give you a drink or two whenever you want it, because he will want to use you next Monday." There is no ex- planation why the people did not call Foley himself as a witness, or did not attempt to identify the unidentified young man.

The proof adduced against the defendant Brennan is in substance as follows :

Edward J. Barrett testified: " I came to Chicago May 29th, with James E. Crown. We put up at the Salvation Army headquarters, 118 West Madison street. John J. Brennan's saloon is at 114 West Madison street. Crown and I came from St. Louis. We were practically broke— down to small change. At the Salvation Army headquar- ters I met a man called Foley. Crown remarked that he must get out and hustle the first thing Monday morning for a job. Foley said, ' You don't need to be broke; go down and see old man Brennan and he will stake you to your lodging and meals, and give you a drink or two whenever you want it, because he will want to use you next Monday (election day). I next saw Foley on the morning of June first, at the Salvation Army headquarters. He said to a man named Murphy, ' Murphy, why the hell don't you go down and vote ? ' Murphy said, ' The price don't suit me; it isn't long enough.' I walked up to Foley and said in an undertone, ' What have I got to do to earn this half case ? ' he said, ' All you have got to do is to go down and vote.' I told him that I was not registered, and he said, ' That don't make a damned bit of difference; everything is fixed up. There isn't any risk.' I said, ' All right.' I told Foley that I had been in the city only forty-eight hours. Then we went downstairs together and entered Brennan's saloon. Foley treated to the drinks. Then Foley introduced me to a young man, dressed in a light overcoat, rather slender

build, black derby hat, and smooth face, who had the gen-
eral appearance of being a clerk.  I do not know the name
of this young man.  I have never seen him since.  He held
in his hand a copy of the registry list.  Foley said to this
young man, 'This is one of our people; belongs upstairs,
and he will go through; he is all right.'  Then the young
man wrote on a small writing pad, 'John Veneman, 126
West Madison street,' and gave me a slip of paper contain-
ing that name and address, and told me that I had better
take the slip, although I informed him that I could remember
that.  That young man also told me there was no risk at
all, that everything was fixed, and in reply to my question,
'Where do I get the coin?' said, 'The old man will fix you
inside as soon as you have voted.'  The defendant Kent
stood by when this young man was writing the ticket for
me, and they exchanged a few words, which I did not catch
the import of.  I asked the young man who handed me the
slip of paper how old Veneman was, and he said that didn't
make any difference.  I then went into the line of voters.
Eight or ten were ahead of me.  Four of the men ahead of
me had similar slips to the one I had in my hand, although
I had mine crumpled up.  Brennan was standing in the
polling place between the voting booths and the line of
voters.  McCarle was standing at the head of the line of
voters, between the polling box and the voting booth.  I
saw McCarle go into the booth with four of the men in line.
These four men came out of the voting booths, gave their
ballots to the judge of election, and then passed out, and as
they passed out Alderman Brennan had his hand in his
right pocket and passed it that way (indicating an extend-
ing of his right hand toward the person that passed out).
I don't know what Brennan did.  I gave my name to the
judge of election as John Veneman, 126 Madison street.  A
ballot was handed me.  Then the alderman plucked me by
the elbow and took me into the second booth and said,
'You don't know how to mark this ballot, do you?' and I
said 'No.'  He had a small stub of a pencil in his hand and
he marked a cross in the circle at the top of the second-
hand column, and marked a cross opposite a number of

names in that column.   Then he came back to the first column and marked two names there near the top.   I had not asked for assistance.   After Brennan marked my ballot he folded it and handed it to me and came out and pointed to the ballot box and told me to go over there and put it in the box.   I handed the ballot to Kelly, one of the judges of election.   I then walked out of the polling place and as I passed Alderman Brennan, he drew his right hand from his pocket and handed me two twenty-five cent pieces.   I never spoke to Alderman Brennan in my life except in the polling booth.   I then went to the corner of Madison and Desplaines streets, where I met Mr. Crown in front of Brennan's saloon.   Crown and I then went to the Chicago American office.   I there saw the city editor and told him what I had done.   Then I met reporter Lait of the Chicago American and returned with him to the polling place.  Lait was dressed in rough clothing.   I then went with Lait and Crown to the Salvation Army reading room."

James E. Crown, testified :   " I have known Edward J. Barrett for several years.   I came to Chicago two or three days before the judicial election.   I went with Barrett to the Salvation Army on Madison street.   Brennan's saloon was on the corner below where we put up.   I remember a conversation in the presence of Barrett in regard to our being broke.   A gentleman sitting next to us said :  ' You boys need not be in hard luck.   Go down to Brennan's saloon and he will take care of you until election day.   He will pay your board and he will give you lodging here until election day.'   That is what this gentleman said that sat next to Barrett and me."

The foregoing is all the proof in the record against Brennan except that given in rebuttal by one Waseca, who testified as follows :   " I voted at the election held June first in the twenty-seventh precinct of the eighteenth ward.   I saw the defendant Brennan there.   There were about eight men in front of me.   I saw Brennan go into the booth with two men who had ballots.   Brennan asked me if I could mark my ballot, and I answered ' I should say.' "

The above testimony, it should be noted, relates only to the charge of procuring and assisting in the false personation of Veneman by Barrett. It connects Brennan in no way with the charge of procuring and assisting in the false personation of Flysen by Lait.

Brennan took the stand and denied all of Barrett's testimony in so far as it pertained to what occurred in Brennan's presence and hearing. He swore that he had not seen Barrett before the trial and never had anything to do with him; that he did not mark his ballot or give him fifty cents, or give anybody else any money on election day in the polling place; that he did not know Foley and had never heard of him before the trial and had never had any talk with him and never had an understanding with him or with Kent; that he did not know the man Murphy mentioned by Barrett. Brennan's denial of the truth of the incriminating testimony was as complete as it possibly could be.

The question therefore arises, were the jury justified in believing Barrett? If Barrett did not tell the truth, or if there be a reasonable doubt of Brennan's guilt, the verdict against him cannot stand. No one but Barrett testified that Brennan marked a ballot or paid money to a voter.

In our opinion Barrett's testimony where denied and not corroborated is entitled to little, if any, credit. If he is to be believed, he was willing to and did for a money consideration commit the crime of falsely personating another person and voting in his name. At the time of the trial he was thirty-nine years old. Since arriving at manhood he has been wandering from one place to another, staying at each for a short period only, a confirmed drunkard and unable to retain employment for any length of time. He refused to disclose by what name he went or where he lived in Chicago before he was fourteen years old. He had abandoned his wife and declined to state how long that abandonment had lasted. When he arrived in Chicago the last time with his boon companion, Crown, they were both penniless and sought and obtained free board and lodging at the headquarters of the Salvation Army. Afterwards, as

he states, he got the money to pay his board from the state's attorney's office. A reward of $1,000 had been offered by a newspaper in Chicago on the day of election "to any person who will first furnish to" it "evidence that will convict the principal or principals of vote buying in Alderman John J. Brennan's (the eighteenth) ward or any other ward in this city," and he testified "I expect and hope to get that reward." He is contradicted by his companion, Crown, on a material point relating to what Foley is claimed to have said to them. According to Barrett, Foley said that "Brennan will want to use you next Monday" (election day). Crown in giving his version of the same matter testifies to no such language on Foley's part but makes him say "he (Brennan) will take care of you until election day."

On the other hand it appeared that the defendant Brennan was and had been an alderman in the city of Chicago for fourteen years, having been re-elected six times. He has been in public life for over thirty years. His reputation for truth and veracity was not questioned or assailed at the trial, and so far as appears he was never before charged with any questionable conduct. Waseca's testimony that he saw Brennan go into the booths with two men does not contradict Brennan, who had in substance and effect merely testified that he had gone in only once to mark Judge Hanecy's name, namely, when he voted himself at another polling place.

No witness was called by the people to corroborate Barret as to the existence of Foley or the unknown young man. Each of the defendants testifies that he did not know and never heard of Foley or the unknown young man. According to Barrett, Brennan was standing at the door handing money to voters as they passed out of the polling room. Yet he is the only one who so testifies. If the fact was as he swears it to have been, it was in all likelihood seen or in some way noticed by many people, the judges and clerks of election, voters and bystanders. But none of them was called as a witness.

The incriminating proof against McCarle is to the effect that he went into the polling booths with voters and marked their ballots and handed two silver quarters to one of them. Further than that the proof does not go. He denied the truth of the charges. Conceding the testimony to be true, while it appears that he violated the law which forbids and punishes the acts committed by him, it does not appear that he was guilty of the offenses for which he was indicted and tried. It is not shown that he knew that any of the voters whose ballots he marked were personating or attempting to personate anybody else. Nor is it shown that he was a member of or engaged in any conspiracy unless such proof be furnished by the mere fact of his being at the polling place and doing what he did. For that purpose the proof is not sufficient. At the very least, he is entitled to the benefit of a reasonable doubt. If he did not know that any false personation was attempted or going on and was not a member of any conspiracy or knowingly engaged in carrying out the common design, it follows that he was not procuring false personation or assisting therein.

In reversing this judgment as to the defendants Brennan and McCarle, we do not close our eyes to the testimony tending to show the committing by at least one of them of offenses for which, if they are guilty, punishment should and may be inflicted, upon the institution of proper proceedings. It is this very testimony which we are satisfied confused the jury and misled them into rendering a verdict not warranted by the evidence so far as these two defendants are concerned. To falsely personate a voter or assist therein or to procure it to be done, is one offense; to accompany a voter into the polling booth and mark his ballot without authority of law, is another. For the proper administration of the law and in order to secure justice, it is of the utmost importance, and the law requires that every accused person shall be tried only for and upon the charge made against him, and of which he is formally apprised by the indictment. It is only in that way that he can prepare

his defense and meet his accuser fully equipped. Such is the fixed, inflexible rule never departed from even in civil matters where only property rights are involved. How much more should it be insisted upon and rigorously enforced when the liberty or life of the citizen is at stake?

The case against defendant Kent stands upon a different footing. The proof tends to show that he committed the offense charged against him in the indictment; that he furnished divers persons with information and slips of paper for the purpose of enabling them to personate and vote in the name of others; that he was present when the unidentified young man did the same thing; that the persons so supplied actually did personate other electors and vote in their names.

Other errors are assigned and argued, but we do not regard them as possessing sufficient merit to affect or alter the conclusion at which we have arrived.

The judgment of the Criminal Court is affirmed as to plaintiff in error Kent. As to plaintiffs in error Brennan and McCarle, it is reversed and the cause remanded.

*Affirmed in part; reversed in part and remanded.*

MR. PRESIDING JUSTICE FREEMAN, dissenting.

I am unable to concur in the conclusion of the majority of the court as to Brennan and McCarle, or in the reasoning upon which it is based. The importance of the case in its bearing upon the purity of the ballot, seems to demand a statement of the reasons for my dissent.

If Brennan and McCarle knew that the false personation charged in the indictment was attempted or going on, and were engaged as accessories or co-conspirators with others, carrying out or assisting to carry out such common purpose, they were rightfully found guilty under the counts of the indictment upon which they were convicted. The allegations of the indictment in this respect are " fully supported by proof that another did that which is directly alleged to have been done by the accused, if it be shown the accused was present, and as in this case aided, advised,

encouraged and assisted such other to do the prohibited acts." Lionetti v. The People, 183 Ill. 253–255.

Is there room for a reasonable doubt of the guilt of Brennan and McCarle as charged, and as found by the jury before whom they were tried? The reversal as to Brennan is based upon the view that the witness, Barrett, did not tell the truth, is not worthy of belief, and is not corroborated as to material matters; and it is claimed that the only direct evidence connecting Brennan with the common purpose charged in the indictment is Barrett's testimony. This is cast aside and characterized as unworthy of belief against the denials of Brennan, the alderman of fourteen years' service, whose veracity is said not to have been questioned or assailed at the trial. But Barrett's is not the only evidence so connecting Brennan, and the veracity of the latter is in my judgment successfully assailed and impeached by other reliable evidence. He is so connected with the common purpose and its performance by the evidence of the witness Lowry. The latter testifies to seeing the defendant Kent in Brennan's saloon talking to several men. Kent held a cardboard containing printed slips of names on it. He had a pad and a pencil in his hand and was checking off names. He called out numbers and "occasionally a man would come up and accept the number" and receive directions, with a slip from the pad on which Kent wrote items of information for guidance in answering questions of judges of election. The witness also saw Brennan in the polling place holding a cardboard similar to the one Kent had. Several times the witness saw Brennan "just outside of the polling place door and in the polling place door talking to Mr. Kent. Each man held up the cardboard for the inspection of the other man, and made pencil marks." This evidence tends to show them working together for the common purpose. They were afterwards seen talking together in the rear part of Brennan's saloon. Brennan's veracity is moreover directly assailed and impeached by the testimony of Waseca, conceded to be a reputable citizen entitled to credence, whose evidence I shall refer to in another connection.

But why should Barrett's testimony be thus cavalierly disregarded and declared unworthy of belief as against that given by Brennan in his own defense? The witness Barrett it is true, frankly admitted that he had been for a considerable time a victim of the habit of intoxication. From a once prosperous man, he had reduced himself to a condition where it was difficult for him to obtain or retain employ,ment. He had been and still is a newspaper reporter. No charge of crime has been made against him so far as appears, and he has never been in prison. He was, at the time he was induced to obtain fifty cents by fraudulent voting, in receipt of free board and lodging from the Salvation Army. He had not heard of the reward offered by the newspaper referred to in the majority opinion, until after he had voted in Veneman's name. 1 am unable to find in the record anything that would warrant court or jury in disregarding his testimony. The jury and the trial court believed him, and refused to believe Brennan in his denials of what Barrett had sworn to, and their finding on such a question should be deemed conclusive. A fair consideration of the testimony of the two shows more reason to doubt Brennan's veracity than Barrett's. The former contents himself with merely denying specifically the incriminating features of Barrett's statement without attempting to make any explanation of other evidence against him. This he had a right to do, but in the attempt to ascertain what evidence is trustworthy, a careful scrutiny is full as favorable to Barrett as Brennan. There is nothing against Barrett so far as appears except his habit of drinking and his connection with the present case, which he seems to have gone into as much at least from a newspaper reporter's standpoint as from a criminal intent. He went at once after voting, and told the facts at a newspaper office, and then and there made an affidavit of the matters to which he testified. He, with Lait, another reporter, went back to the polling place. There Lait voted in the name of Flysen, and then wrote up the story for his newspaper. In Collins v. The People, 98 Ill. 584, 594, it is said by Mr. Justice

Scholfield, speaking for the Supreme Court: "We must recognize the fact, in considering cases of this kind, that honest men and women rarely, and then only casually, are in the company of thieves and burglars, and are still more rarely admitted into their confidence, and hence that witnesses of their guilt, of necessity must very often be taken from those who are no better than themselves." If the example to be set in this case is followed generally, hereafter no evidence which is obtainable in cases of this kind will be considered worthy of belief when denied by the party indicted for the offense; and crimes of this character may go unpunished if the views stated in the majority opinion are to obtain in courts of review. The point is made that Barrett is the only one who testifies to Brennan's alleged conduct, although in all likelihood others must have seen it. The record shows that at least one other witness was called, who was present in the polling place, but who refused to testify on the ground that it might tend to incriminate himself. It is at least reasonable to suppose from this record, that others best informed as to what transpired were "tarred with the same stick," and would, in like manner, refuse to testify, and for the same reason.

The statement in the majority opinion that the testimony relating to the charge of procuring and assisting in the false personation of Veneman by Barrett "connects Brennan in no way with the charge of procuring and assisting in the false personation of Flysen by Lait," seems to me not warranted by the evidence. There is evidence tending to show that the defendants were all working together for a common purpose, which purpose was carried out no less when Lait was procured and assisted in the false personation of Flysen than when Barrett was procured in the same way by Brennan in person to falsely personate and vote in the name of Veneman. The evidence discloses the defendant Kent and a young man whose identity is not shown, operating together with a man named Foley. The place is the saloon of the defendant Brennan. Foley makes the arrangement with Barrett, whom he is informed is not registered, to go

down and vote, promising that he will earn a " half case," and that there is no risk, that everything is fixed up. Foley brings in the unknown, saying to the latter, " This is one of our people—belongs upstairs and he will go through; he is all right." The unknown looks over a list and writes on a pad in his hand the name " John Veneman, 126 Madison Street." In reply to Barrett's question " Where do I get the coin ? " he answers, " The old man will fix you inside as soon as you have voted." The defendant Kent stands by at the time conversing with the unknown. When Barrett gets into the line of voters at the polling place he discovers four men ahead of him in the line with slips similar to that he has in his own hand. In the case of four of the men in line Barrett sees the defendant McCarle go into the voting booth with them, and as the men come out and give their ballots to the election judges, Brennan takes his hand from his pocket and passes it " you know that way (indicating)." Barrett gets a ballot and the defendant Brennan plucks him by the elbow and takes him into the second booth from the window, saying " You don't know how to mark this ballot—make out this ballot, do you?" to which Barrett answers " No." Brennan marks the ballot, folds it up for Barrett and tells the latter to put it in the box. This is done, and as Barrett approaches, the defendant Brennan again draws his hand from his pocket and Barrett receives two quarters of a dollar. If other men went into the line of voters with slips of paper like that given to Barrett, if McCarle went with them into the voting booths as Brennan did with Barrett, and if when they had voted Brennan's hand went in and out of his pocket in the same manner as when Barrett became the recipient of a half dollar, if subsequently Lait, piloted by Barrett, procures from the defendant Kent a slip of paper bearing the name of William Flysen and similar to that given Barret having the name of Veneman, if when Lait gets a ballot and goes into the voting booth McCarle again turns up, this time to mark Lait's ballot, and if McCarle hands out to Lait the half dollar after he has voted, as Brennan had

to Barrett, then the conclusion is amply justified that Foley and the unknown and the defendants Kent and Brennan and McCarle were working together for the same common purpose, a part of which was to procure not only Barrett to falsely personate and vote in the name of Veneman but Lait also to falsely personate and vote in the name of Flysen, which purpose was accomplished. Such evidence connects all three of the defendants with procuring and assisting in the false personation of Veneman by Barrett and of Flysen by Lait.

Reference is made to the evidence of the witness Waseca, which it is contended by counsel for the defendants was erroneously admitted in rebuttal. This evidence is strongly corroborative of Barrett and directly contradicts Brennan, in a matter important to the latter's defense, volunteered by him on cross-examination. If it is a fact, as Brennan states, that he did not go into the voting booths that day except with his own vote, then Barrett's whole testimony with reference to Brennan is vitally discredited. Waseca testifies that he voted that day in the twenty-seventh precinct of the eighteenth ward about seven o'clock in the morning; that Brennan was there and went into the polling booths with two men, and that Brennan also asked the witness if he knew how to mark his ballot. It was urged by counsel for plaintiff in error that the testimony of this witness was not in rebuttal of any evidence of Brennan's on his examination in chief; that the trial court admitted it under an erroneous impression in that regard; that it does not contradict Brennan's statement on cross-examination that he did not enter the voting booths with voters and mark their ballots for a certain specified candidate; that it does not bear directly on the charges contained in the indictment, but tends to prove an unlawful act not so charged; and that this testimony by a respectable citizen was highly prejudicial to Brennan. But prejudicial or not it was properly admitted, and entirely competent. Brennan had testified not only that he did not go into the voting booth and mark Barrett's vote, as the latter says he did, but to

strengthen his case had gone to the extent of denying that he went into the booths at all except when he himself voted. The evidence of Waseca that he saw Brennan go into the voting booths with two men not only tended to corroborate Barrett's testimony in chief, but it also tended to contradict Brennan's statement that he went into the polling place merely to get away from a mob clamorous for drinks, and that he was not doing there any particular thing. In this view the evidence of Waseca was strictly proper rebuttal. But whether so or not its admission rested in the reasonable discretion of the trial judge and is not properly subject to review here. In Thompson on Trials, vol. 1, sec. 346, it is said that "the admission or exclusion of evidence not strictly in rebuttal is a matter resting in the discretion of the trial court, the exercise of which discretion is not subject to review except in case of gross abuse," the better view being "that where the plaintiff's *prima facie* case is vigorously assailed he should be allowed to introduce in rebuttal additional corroborative evidence." As to what constitutes corroborative evidence the generally accepted doctrine is that it extends to facts which connect the defendants with the offense. Bishop on Criminal Law, vol. 1, sec. 1170. That the admission of this evidence was within the discretion of the trial judge, is supported by adjudicated cases in this and other states. The language used in Collins v. The People, 98 Ill. 584, 595, is applicable here : " Some objection was urged against the testimony of Geraty on the ground that it was not rebutting. The order of admission of evidence is largely discretionary with the trial judge. The defense were not denied the right to rebut any matter testified to by Geraty, which they claim was original testimony; and we cannot, even conceding that it be true that some of his testimony was such as should have been given in chief, perceive the defendant has been injured. No such abuse of discretion is apparent as would require a reversal of the judgment." In Wright v. Foster, 109 Mass. 57, it was held that admission of evidence to corroborate the plaintiff's testimony in chief affords the defendant no

ground of exception. The court said that " it corroborated the plaintiff in material parts of the transaction to which he testified, and would have been admissible for him in chief. Being so, it was within the discretion of the presiding judge to admit it at any stage of the trial." In Commonwealth v. Moulton, 4th Gray (Mass.), 39, a trial for larceny, where objection was made to the testimony of a witness called after the Commonwealth had closed, it is said: " This objection is only to the order of introducing evidence, which must always be regulated by the discretion of the presiding judge." In Cushing v. Billings, 2 Cushing (Mass.), 158, Chief Justice Shaw says : " We take it to be well settled that the order in which witnesses shall be called is a matter of discretion with the court;" and further that " it is competent for the judge according to the nature of the case to allow a party who has closed his case to introduce further evidence   *   *   *   within the absolute discretion of the judge." To the same effect are A. & E. Encyc. of Law, vol. 15, 384, 385; Robinson v. Kirkwood, 91 Ill. App. 54, 57; Bussey v. Hemp, 48 Ill. App. 195, 198; Maxwell v. Durkin, 185 Ill. 546, 551. The testimony in question has an important bearing upon the credibility of Barrett, whom it corroborates, and of Brennan, whose veracity it impeaches.

The guilt of the defendants should be established beyond a reasonable doubt. This is defined as meaning in law " a serious, substantial and well-founded doubt, and not the possibility of a doubt; and neither court nor jury have a right to go outside the evidence to search for or hunt up doubts (in order to acquit the defendant) not arising from the evidence or want of evidence." Earle v. The People, 73 Ill. 329, 334. I cannot see that upon the showing made in this record the character and conduct of Barrett do not compare favorably with that of the defendant Brennan, who explains his presence in the polling place by the excuse that he was pursued by a mob clamoring for drinks—itself a significant fact on an election day—from which he sought refuge there. In my judgment the guilt of Brennan as well

Feitl v. Chicago City Ry. Co.

as that of McCarle is established beyond a reasonable doubt by evidence worthy of credence, and the verdict of the jury and the judgment of the trial court are fully justified and ought not to be interfered with.